Because I believe the majority employs the wrong standard in determining whether it was proper for the chancellor to change the custody of Carolyn Smith from her mother to her father, I respectfully dissent. The testimony of Mary Jones Smith and Glen Smith (Carolyn's stepfather) is sufficient to warrant the chancellor's determination that there was substantial evidence adduced at trial to warrant a change in custody. Because there was sufficient evidence adduced at trial to support the modification of custody, I would affirm the chancellor's decision. Therefore, I respectfully dissent.
 STANDARD OF REVIEW
This Court will not overturn the decision of a chancellor in domestic cases when those findings are supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, or the chancellor applied an erroneous legal standard. Crow v. Crow, 622 So.2d 1226, 1228 (Miss. 1993);Gregg v. Montgomery, 587 So.2d 928, 931 (Miss. 1991). As a result of our deferential standard of review given to chancellor's findings, the chancellor's findings will only be overturned if they are manifestly wrong. Whitworth v. Kines,604 So.2d 225 (Miss. 1992); Wing v. Wing, 549 So.2d 944 (Miss. 1989).
 THE LAW MODIFICATION OF CHILD CUSTODY
Our law, with regard to a modification of a decree for child custody, is well settled. This Court's standard for modification of child custody is found in Ash v. Ash, 622 So.2d 1264 (Miss. 1993). First, the moving party must prove by a preponderance ofthe evidence that, since entry of the judgment or decree soughtto be modified, there has been a material change in circumstanceswhich adversely affects the welfare of the child. Id. at 1265. Second, if such an adverse change has been shown, the moving party must show by like evidence that the best interest of the child requires the change of custody. Id. at 1266. The majority in the case sub judice argues that the chancellor's decision was manifestly wrong because John Jones did not demonstrate that Mary Jones Smith and Glen Smith were physically sexually abusing Carolyn. It has never been my understanding of our law that the party seeking modification of custody had to demonstrate that the child had been physically sexually abused.
I would suggest that it is not necessary for John Jones to demonstrate that Carolyn was physically or sexually abused in order for him to gain custody of his daughter. It was only necessary for John to show, by a preponderance of the evidence, that there had been a material change in circumstances which adversely affected the welfare of Carolyn, and that the best interest of the child required that the change in custody be made. Ash, supra.
The wisdom of the chancellor's decision to modify Carolyn's custody is apparent when we consider the following colloquy between Mary Jones Smith and John's attorney during the trial.
 Q. And at times, especially since April of 1990, you've had sexual intercourse and other sex [sic] contact with Mr. Smith at times when your daughter was in the room with you, have you not?
 A. Repeat yourself. *Page 493 
 Q. You have had sexual contact with Mr. Smith or isn't it true that you've had sexual contact with Mr. Smith, and by "sexual contact," I mean sexual intercourse and oral sex and other forms of sexual contact —
 A. I understand that part.
 Q. — since April 25 of 1990, at a time when Carolyn Smith was in the room with you, haven't you?
 A. Not till after we were married.
Mary Jones Smith further testified that she and Glen engaged in physical fights in front of Carolyn. The following exchange took place between Mary and John's attorney.
 Q. Well, it's true that you have physical fist fights on a regular basis is it not?
 A. Pushing and shoving, yes.
 Q. And hitting?
 A. Not on a regular basis, though.
 . . . .
 Q. Tell me, at this time, how often, on the average, you recollect those fist fights between you and him to have been?
 A. You're wanting to know what? You're wanting to know how often?
 Q. Yes, on the average.
 A. Maybe once every two weeks. I — I don't know. Maybe once a month, maybe once every two months. I did not keep a record of it.
 Q. Now, these are in the presence of Carolyn, more importantly, aren't they?
 A. On occasion they have been, yes, sir.
 Q. Naturally, very upsetting to the child?
 A. Sometimes — she would be scared that he would hurt me.
 Q. Has he hurt you?
 A. Plus, she didn't realize that I was protecting myself.
 . . . .
 Q. And isn't true that, when you have these fights, that it upsets Carolyn and she cries or just goes into hysterics sometimes?
 A. I wouldn't say hysterics. She cries.
Mary also testified that she and Glen frequently get into swearing matches in front of Carolyn. In later testimony, when questioned further about having sex in Carolyn's presence, Mary testified as follows.
 Q. Okay. Do you know how many times that you've had sexual relations while she (Carolyn) was in the room?
 A. No, I don't
 Q. Do you have an estimate?
 A. Maybe two times. I — I don't know.
 . . . .
 Q. Now, would you tell the Court whether or not you were on top of the covers or under the covers?
 A. Under the covers, always.
 Q. Where was Carolyn?
 A. She'd usually sleep down at the end of the bed or just, you know —
 Q. On the end of the bed?
 A. On the end of the bed. Sometimes, when Glen wouldn't be home and he was working 11:00 to 7:00 in the morning, she would sleep beside the bed by me, because she felt, you know, better like that.
 Q. Is this on the floor?
 A. Yes.
 . . . .
 Q. How do you — do you know whether or not she was asleep when this happened?
 A. Yes, I do know that.
 Q. How do you know that, Mary?
 A. Because my child is a sound sleeper. I mean, she can wet the bed and still stay asleep at night. She won't even know she's wet the bed until I wake her up in the morning time.
On cross-examination, when asked about having sex while Carolyn was in the room, Mary testified as follows.
 Q. Your testimony here is you've had what all different kinds of sex with your husband, while your daughter was in the bedroom asleep?
 A. Just the regular.
 Q. Intercourse?
 A. Yeah.
 Q. No oral sex? *Page 494 
 A. I don't remember. Do you remember when you had — what you do all the time?
 THE COURT: You can't ask the questions now. He'll ask the questions.
 A. Yes, sir. I'm sorry.
 Q. You don't remember just any of the peripherals? You don't remember if it was intercourse or oral sex or what kind of sex it might have been; but you remember specifically it was only two times?
 A. I did not specifically say two times. I told you I was not sure.
 Q. Well, it could have been many more than two, then, couldn't it, if you're just not sure?
 A. I'm not sure.
 Q. And you don't dispute that it could have been considerably more?
 A. It could have been three times. I don't keep a record of it.
 Q. Four times?
 A. I don't know.
 Q. Could have been?
 A. I don't know.
 Q. Oral sex?
 A. Very rarely, I'll put it that way.
 Q. Well, it could have been, couldn't it?
 A. I don't like it, sir.
 . . . .
 Q. You've had oral sex with your husband, while your daughter was in the bedroom, haven't you?
 A. Possibly. I — I may have. I don't know.
 . . . .
 Q. Please understand that it is not my intent to upset you or to embarrass you. I just simply want to get at what you know; and I want to know whether or not you can be positive as to whether or not you've had oral sex, while your child was in the bedroom with you?
 A. I may have, sir. I — I — you know, I think I did. I don't really remember.
Glen Smith's testimony was similar to Mary's testimony. He testified that he and Mary had had sex while Carolyn was in the room but that Carolyn was always on the floor during these sessions. Glen did testify that Carolyn was asleep and did not see the couple having sex. However, Glen's testimony as to how he knew Carolyn was asleep during the couple's sexual trysts is inconsistent and it is entirely possible that the chancellor could have determined that Glen and Mary could not be sure that Carolyn was always asleep during their lovemaking. Glen denied that they had engaged in oral sex while Carolyn was present in their bedroom.
When considering the totality of the circumstances, it is apparent that the chancellor's decision to grant custody of Carolyn to her father was not manifestly wrong. Tucker v.Tucker, 453 So.2d 1294, 1297 (Miss. 1984), citing Kavanaugh v.Carraway, 435 So.2d 697, 700 (Miss. 1983). First, the evidence showed by a preponderance that there had been a material change in circumstances which adversely affected the welfare of the child. Second, John demonstrated that the best interest of the child required the change of custody. Pace v. Owens,511 So.2d 489, 490 (Miss. 1987).
In the case sub judice, we cannot say that the evidence did not show by a preponderance that Mary and Glen engaged in sexual intercourse and oral sex in Carolyn's presence. The testimony was such that Mary Smith and Glen Smith both testified that they had engaged in sex while Carolyn was in their room. Mary Jones Smith testified that she and her former husband, John Jones, had not had sex in Carolyn's presence during their marriage. Carolyn has gone from a family situation in which her parents did not have sex in her presence to a situation where her mother and stepfather admitted that Carolyn was in their bedroom on several occasions when they engaged in sexual activities.
The testimony put on by John certainly demonstrated that it was in Carolyn's best interest to remove her from the environment she was exposed to while living with her mother and stepfather. In addition to the evidence of sexual misconduct, John put on evidence to show that Mary and Glen engaged in frequent physical brawls in Carolyn's presence; that these fights frightened *Page 495 
Carolyn and caused her to cry; and that Glen and Mary engaged in frequent verbal disputes that turned into swearing matches. This too was done in Carolyn's presence. When these factors are combined, it is apparent that the Smiths engaged in a continuous pattern of misconduct that threatened the well-being of Carolyn Jones. Therefore, it is evident that John demonstrated that it was in Carolyn's best interest to remove her from such a damaging environment.
The evidence established at trial showed that John Jones and his new wife, Shirley Jones, are loving, caring parents, that are genuinely concerned about Carolyn's well-being. The Joneses are, for all practical purposes, a stable couple, and it appears that Carolyn has responded quite well to living with her father and new stepmother. The Joneses regularly attend church with Carolyn and have displayed an active interest in Carolyn's progress in school. It is evident to me that the chancellor correctly decided that John Jones should have custody of his daughter.
 CONCLUSION
The majority argues that Carolyn's exposure to Mary and Glen's sexual activities was inadvertent. However, the testimony clearly shows that the couple engaged in sex on more than one occasion while in Carolyn's presence and it appears that, on at least one occasion, the couple had sex while Carolyn was at the foot of the bed. Mary could not testify to the exact number of times that she had had sex in Carolyn's presence, but seemed to indicate that she and Glen might have engaged in sex at least four times in Carolyn's presence. The Smith's sexual conduct is but one element among many that establish their continuing misconduct in the presence of Carolyn. Glen and Mary's decision to initiate and conduct sexual relations while all the time knowing that Carolyn was present in their bedroom is inexcusable. One time may be inadvertent, but repeated instances of sexual activity in Carolyn's presence goes far beyond inadvertence. Therefore, when we consider the "totality of the circumstances," it is evident that the chancellor was correct in modifying Carolyn's custody and thus, I would affirm the chancellor's order.
Accordingly, I respectfully dissent.